825 So.2d 116 (2001)
G.R.V.
v.
M.V.
2991154.
Court of Civil Appeals of Alabama.
May 4, 2001.
Rehearing Denied August 3, 2001.
Certiorari Denied December 28, 2001.
*117 J. Ronald Boyd and Charles H. Dunn of Boyd & Fernambucq, P.C., Birmingham, for appellant.
Stephen R. Arnold and Douglas A. Dellaccio, Jr., Birmingham, for appellee.
Alabama Supreme Court 1001998.
YATES, Presiding Judge.
This is a custody-modification case. The trial court divorced the parties in June 1996. Pursuant to an agreement between the parties incorporated into the divorce judgment, the trial court, among other things, awarded physical custody of the parties' minor child to the mother, with reasonable visitation to the father.
In January 1999, the father petitioned for a change in custody, alleging a material change in circumstances and requesting that the court appoint the child a guardian ad litem. In March 1999, the father moved for temporary custody, alleging that the then four-year-old child had been physically abused and possibly sexually abused by his teenaged halfbrother. The mother counterpetitioned for an increase in child support. In May 1999, the mother moved for a writ of habeas corpus, after the father had refused to return the child to her following the father's scheduled weekend visitation. The court entered a consent order requiring, among other things, that the father immediately return the child to the mother, that the mother not permit the minor child to be alone with his older halfbrother, and that the parents and the child and the halfbrother obtain psychological evaluations.
After conducting an ore tenus proceeding, the court, on May 26, 2000, entered an order denying the father's petition for custody. The order stated, in part:
"2. [The mother and father] shall attend and complete the parenting classes offered through GATEWAY FAMILY COUNSELING, Children Cope with Divorce Program....
". . . .
"4. It is curious that the testimonies of the purported victim[the child] and the alleged perpetrator[the halfbrother] were not offered by the [mother, father], or the Guardian Ad Litem. This observation is not to be construed as disclosing any particular inference drawn by the Court from these choices. In fact, there are a number of rational conclusions from which to choose.
". . . .
"9. Based in part on the stipulation of the parties:
"(a) [The child] shall receive individual psychotherapy with a clinician who has training and experience in working with young children, and who also has *118 training in the psychodynamics of divorce. Parental access to this therapist is restricted except at his or her request. The clinician shall be selected or agreed upon by both parents. Failing agreement, this Court shall be notified not less than 30 days from this Order.
"(b) [The halfbrother] is in need of therapy to address his peer relationships; adjustment to adolescence, including sexuality; issues of trust, anger and anxiety; and other unresolved problems, including his parents' divorce and family relationships. The [mother] shall forthwith initiate an appropriate program of therapy for [the halfbrother] with an individual psychotherapist.
"(c) A parenting coordinator shall be selected to work directly with the parents and assist them in improving their coparenting relationship, monitor potentially abusive situations, and mediate conflicts. The coordinator shall be a clinician trained and experienced in the dynamics of high conflict divorce, with a solid understanding of child development.
"(d) Both parents shall read the following texts to work harder to improve their co-parenting skills: [naming texts].
"[The mother] shall receive specific parent training regarding effective limit setting. Both parents should be given feedback by this evaluator as soon as possible so that they can have the opportunity to immediately begin to address needed areas."
The court denied the father's motion to reconsider, on June 14, 2000. The father appeals, arguing that the court erred (1) by not applying provisions of the "Custody and Domestic or Family Abuse Act," § 30-3-130, Ala.Code 1975, and (2) in its application of the law to the particular facts of this case. The dispositive issue is whether the father presented sufficient evidence to warrant a change of custody pursuant to Ex parte McLendon, 455 So.2d 863 (Ala. 1984). This court has stated:
"When a noncustodial parent seeks a modification of a prior custody determination, the evidentiary standards set forth in Ex parte McLendon, 455 So.2d 863 (Ala.1984), must be applied. The McLendon standard applies when the parents share joint legal custody and a previous judicial determination places primary physical custody of the child with one parent. Scacca v. Scacca, 694 So.2d 1 (Ala.Civ.App.1997); see also Ex parte Bryowsky, 676 So.2d 1322 (Ala. 1996) (holding that McLendon standard applied where agreement between the parties granted the parties joint legal custody of the child, with physical custody to the mother, and agreement was adopted by the trial court). The petitioning parent must show by substantial evidence that a change in custody will materially promote the child's best interests and welfare. Ex parte McLendon, supra, Etheridge v. Etheridge, 712 So.2d 1089 (Ala.Civ.App.1997). The petitioning parent must also show that the good brought about by the change in custody would more than offset the inherently disruptive effect caused by uprooting the child. Ex parte McLendon, supra. The ore tenus rule is applicable to child-custody-modification proceedings, and the court's judgment based on findings of fact will not be reversed absent a showing that the findings are plainly and palpably wrong. Scholl v. Parsons, 655 So.2d 1060 (Ala.Civ.App.1995)."
P.A.T. v. K.T.G., 749 So.2d 454, 456 (Ala. Civ.App.1999).
The record indicates the following: The father testified that the parties divorced in 1996; that he had remarried in 1997; however, at the time of the hearing he was a widower because his second wife had died *119 of cancer in February 2000. He stated that he is self-employed and operates his business out of his residence. The father stated that in 1998, he began to notice bruises on the child's body and scratches on his face and on other parts of his body. He stated that the child suffered from eczema and that some of the scratches could have been attributed to the skin disorder, but that he had never seen a rash on the child's genital area. He stated that after the bruises and scratches continued, he took the child to a psychologist and a report was made with the Department of Human Resources. After continuing to notice scratches on the child's body, including his genital area, the father contacted the sheriff's department and an incident report was made. The father stated that during 1999 he made at least four to six complaints to the sheriff's department and that he took the child to Children's Hospital on two or three occasions.
Cheryl Alexander, a medical social worker at Children's Hospital, testified that she spoke with the child for about 30 minutes and that during the interview the child pulled down his pants and began playing with his penis. She stated that the child told her that his half brother "wiggles his tee-tee" and, according to the child, "gets on top of him in bed." Dr. Anna Morad, a pediatrician at Children's Hospital, reported that she was called in because there was suspected child abuse, based on the bruises and the information provided by the social worker. She stated that the child had reported that his half brother beats him and had kicked him in the shins. Her report also stated that the child had genital irritation, bruising on the back, leg, and shin; and that although bruises are common for a child of that age, one of the locations of the child's bruises, on his back, was unusual.
Dr. Christine Agee, a clinical psychologist ordered by the court to perform psychological evaluations of the family, reported that the half brother had a history of psychological problems that had begun in kindergarten, that his responses indicated a naiveté about sexual matters, that he viewed sexuality as an area of great discomfort, that he "feels anxious and guilty about his sexual thoughts," and that he had denied any sexual contact with the child. She stated that the statements and indicators from both children indicated that sexual abuse had occurred. She said that according to the child there was at least one incident in which both the half brother and the half sister had touched his penis and that as a result of that incident they were punished by the mother. Dr. Agee opined that "some inappropriate contact" had occurred between the two boys and that the child "may be in a dangerous environment in his current household." She described the mother as being understanding and having sensitivity for the children; however, she said, the mother had problems dealing with stress, minimized the children's problems, and displayed a history of giving inappropriate punishments for their behavior. Dr. Agee also stated that she did not find evidence that the father was actively coaching the child in terms of things to say; however, she said, there was evidence that the mother "was coaching the child to say or not say certain things."
The mother testified that she and the child reside with her current husband and her two older children, a 15-year-old son and a 14-year-old daughter. She stated that the child had been diagnosed with eczema; that the eczema caused him to itch and scratch; and that she attributed the child's bruises to playing and being active. She stated that the child had never complained about any sexual contact by his half brother and that, after hearing the *120 testimony by the experts, she still did not believe her older son had harmed the child. She stated that after an allegation was made in January 1999 she took the children to Dr. Karen Turnbow, a psychologist, and she said she had taken measures to prevent the children from being alone without adult supervision.
The guardian ad litem reported to the court that the child needed to be protected from further sexual abuse. He opined that this protection could occur in the mother's home only if the mother followed the recommendations of Dr. Agee, stopped denying that the abuse had occurred, and provided adequate supervision. He stated, "But if the Court is not convinced that Mom can do those things that are being recommended by Dr. Agee, then Mom cannot adequately protect this child and [the child] must live with Dad." He stated that neither "parent is bad"; however, he said that they both needed help to move forward and provide a healthy environment for the child.
After thoroughly reviewing the record, we conclude that the evidence requires a finding that the present custody arrangement is contrary to the child's safety and well-being. The father produced substantial evidence, by expert testimony, indicating that the child had been sexually abused by his half brother while in the mother's care; therefore, he met the McLendon standard. Accordingly, we conclude that the trial court's order denying the modification of custody was a clear abuse of discretion and was plainly and palpably wrong. We, therefore, reverse the trial court's judgment and remand this case for an order consistent with this opinion.
The mother's request for an attorney fee on appeal is denied.
REVERSED AND REMANDED.
THOMPSON and PITTMAN, JJ., concur.
CRAWLEY, J., concurs specially.
MURDOCK, J., concurs in the result.
CRAWLEY, Judge, concurring specially.
I agree that the father satisfied the burden of proof imposed by Ex parte McLendon, 455 So.2d 863 (Ala.1984), and that the trial court erred by not awarding him custody of the child. As recognized by Judge Yates, the record contains evidence indicating that the child had been sexually abused by his half siblings while he was in the mother's custody. Section 30-3-134, Ala.Code 1975, a provision of the Custody and Domestic or Family Abuse Act, states:
"In every proceeding in which there is at issue the modification of an order for custody or visitation of a child, a finding that domestic or family violence has occurred since the last custody determination constitutes a finding of change in circumstances."
Applying that statute to this case also mandates a reversal of the trial court's judgment.